[Civ. No. 15420.   First Dist., Div. One.   May 18, 1954.]

FRANK S. MARSHALL et al., Plaintiffs and Respondents, v. JESSE LaBOI et al., Appellants; WILLIAM WILSON WURSTER et al., Cross-Defendants and Respondents.

Theodore Golden, J. Bruce Fratis, Robert N. Stefan and Julius M. Keller for Appellants.

Pillsbury, Madison & Sutro, John A. Sutro, Francis N. Marshall and G. H. Eckhardt, Jr., for Plaintiffs and Respondents.

James Martin MacInnis for Cross-Defendants and Respondents.

PETERS, P. J.—The litigants involved in the various appeals here presented are:

Frank S. Marshall, a general contractor engaged in the building construction business, a respondent.

Wurster, Bernardi & Emmons, a copartnership of architects, and respondents.

Sam F. Termini and Alyce C. Termini, husband and wife, who built a home in Hillsborough, and who, directly or indirectly, employed Marshall as contractor, and the Wurster partnership, as architects, to design and construct the house. The Terminis are appellants herein.

Jesse LaBoi, nephew of the Terminis, and world war veteran, also an appellant.

The house involved cost well over $300,000. When it was nearly completed disputes arose between the parties, and the Terminis refused to pay Marshall and the architects large balances claimed to be due. These disputes resulted in the filing of the various actions here involved. Several pleadings and amended pleadings were filed. Only the final amended pleadings appear in the transcript. These need not be summarized in detail because of the limited nature of the issues presented on these appeals. Suffice it to say that from these pleadings it appears that the first action was brought by Marshall against LaBoi and the Terminis to foreclose Marshall's mechanic's lien, and for breach of contract. In addition to the filing of the lien, this pleading alleged the making of a written contract with LaBoi, who, it is averred, acted as agent for the Terminis, LaBoi being charged with being the record owner of the property and the Terminis the true owners, the breach of that contract, and the claim that $104,435.88* was due and owing under it. The Terminis filed an answer and cross-complaint. It was stipulated that the answer should also be deemed to be that of LaBoi. In their answer the Terminis admitted the terms of the contract as pleaded by Marshall, alleged that the work had not been performed as required by the contract, and that Marshall had breached the contract in several respects. As one affirmative defense it was alleged that the contract and the work performed under it were illegal, being in claimed violation of certain pleaded federal statutes and the regulations adopted thereunder. By their cross-complaint the Terminis sought not only to defeat

---

*At the trial by stipulation this sum was reduced to $103,079.10, the amount awarded Marshall by the judgments.

Marshall's recovery of any sum, but also sought damages from him for the claimed breach of his contract to keep the costs as low as possible. By this cross-complaint the Terminis also brought in the Wurster firm as new parties, alleging an oral agreement with the architects to pay them 10 per cent of the building costs to plan and supervise the construction of the house, and praying for damages for the claimed breach of that contract. In addition, the Terminis asked damages based on an alleged fraudulent conspiracy between Marshall and the Wurster firm to maintain an artificially high construction cost. This pleading of the Terminis admitted that the construction of the house had started September 19, 1946.

Marshall filed an answer denying the allegations of the cross-complaint, as did the Wurster firm. In addition, the architects cross-complained against the Terminis for breach of their contract for architectural services, it being averred that a balance was due and owing to them of $16,319.42, the precise amount of the judgment later entered in their favor. No further basic pleadings are included in the transcript, although it is assumed by all the litigants that the Terminis properly pleaded the defense of illegality against the Wurster firm. Certainly, the case was tried on that theory, and it will be hereafter assumed that such issue was properly raised by a proper pleading.

Thus, under the pleadings, the cases involving Marshall presented an equitable action for the foreclosure of a mechanic's lien, and legal actions for breach of contract and conspiracy. The cases relating to the Wurster firm involved legal actions involving breach of contract and conspiracy.

The legal actions were tried before a jury. At the close of the presentation of the evidence on behalf of Marshall and the Wurster film, motions of nonsuit made by the Terminis based on the claimed illegality were denied. But after the Terminis had rested their cases, motions for nonsuit directed against the Terminis' cross-complaints for breach of contract made by Marshall and the Wurster firm were granted on the ground that Termini had admitted that he had consciously engaged in an illegal transaction.

There was then submitted to the jury the questions of breach of contract, conspiracy and common counts for work, labor and material furnished pleaded by Marshall and the Wurster firm, and the affirmative defenses of breach of contract and illegality raised by the Terminis. The jury returned verdicts in favor of Marshall for $103,079.10, plus interest, against

LaBoi and the Terminis, and against the Terminis and in favor of the Wurster firm in the amount of $16,319.42. Judgment was entered on these verdicts. Thereafter, the trial court, on the same evidence, entered its judgment in favor of Marshall in the foreclosure proceeding. Thereafter, the Terminis moved for new trials in all the actions. The trial court denied the motion as to Marshall but purported to grant it as to the Wurster firm on the ground of insufficiency of the evidence on the issue of illegality. This order was made, however, more than 60 days after notice of entry of the judgments, and so was admittedly ineffectual. As a result the motions for a new trial were denied as a matter of law. The Terminis and LaBoi have appealed from the judgments.

A large portion of the lengthy reporter's transcript is devoted to evidence relating to the claimed breaches of contract, to the value of the services rendered, and to the claimed conspiracy. These issues are not involved on these appeals. Appellants now urge only that the contracts and work performed thereunder were illegal, error in the instructions on illegality, and that there was misconduct on the part of the jury. In other words, on these appeals it is admitted that the evidence supports the implied and express findings that appellants breached the contracts, and that the damages recoverable, if not barred by illegality, are in the amounts fixed in the judgments. Appellants likewise concede that the contracts were illegal, being in violation of the federal statutes and regulations. It is their theory that respondents are barred because they participated in such illegality.

On the illegality issue, the statutes involved are the Second War Powers Act of 1942, as amended (56 U.S. Stats. at Large (1942), p. 176), and the Veterans' Emergency Housing Act of 1946, as amended (60 U.S. Stats. at Large (1946), p. 207). Under these statutes, particularly the last, in an attempt to meet the problems caused by the housing shortage resulting from the war, and to aid veterans, an office of housing expediter was created with power by regulation to "establish the maximum sales prices for such housing accommodations," and to issue regulations so as to insure that scarce building materials would be used in construction of veterans' homes. Pursuant to the powers conferred by these statutes, various regulations here relevant were issued. It is not necessary to summarize these regulations and their various amendments in detail. Suffice it to say that under a regulation designated Veterans' Housing Program Order No. 1, and under Priority

Regulation No. 33 a permit to construct a residential structure was required, and permits could only be secured by a veteran for his own occupancy or by a builder who agreed to sell or rent to veterans. No permit would or could be granted, in some situations, where the maximum sale price for a one-family unit exceeded $10,000. Undoubtedly, it was the policy of the F.H.A. not to issue permits where the cost of construction was in excess of $10,000, but at all times here pertinent there was no statutory provision or regulation expressly limiting the cost of construction to $10,000 or to any other sum. Such provision did not become applicable until late in 1946 when Housing Expediter Priorities Regulation 5 became effective. It expressly provided that the estimated cost of the building could not exceed the maximum sale price. It also provided, however, that this regulation was not applicable where priorities and authorization had already been granted pursuant to Veterans' Housing Program Order No. 1, and Priority Regulation No. 33. For this reason appellants now admit that Housing Expediter Priorities Regulation 5 has no application to this case. Violators of the statute or regulations were made subject to criminal and civil penalties. So far as pertinent here, all the relevant statutes and regulations were repealed as of June 30, 1947 (50 U.S.C.A. App. §§ 631 and 1821).

The theory of appellants is that the contracts with the contractor and architects violated the applicable statutes and regulations in two respects: First, that the regulations limiting priority permits to cases where the property was to be owned by or rented to or sold to veterans were violated by the use of LaBoi as a dummy, and secondly, that, under the regulations, permits could not be issued where the cost of construction as well as the sales price exceeded $10,000, and that such provisions were here violated.

Before considering these points a brief résumé of the evidence should be made with particular emphasis on those facts relating to illegality.

Early in 1946 the Terminis owned a building lot in Hillsborough. They approached the Wurster firm and orally agreed to hire that firm for the usual 10 per cent fee to plan and to supervise the construction of a house for them. Through the efforts of the architects Marshall was brought into the transaction as general contractor. He entered into a written contract with LaBoi, nephew of the Terminis, and a veteran, to construct the building on a cost-plus basis. Construction

started on September 19, 1946, before final plans and specifications had been drafted. The house was built in sections, two separate permits being secured from the federal authorities. From the start of construction, the Terminis, through the architects, ordered numerous changes, usually involving custom-made luxury items made of very expensive materials. This caused delays and increased the final cost far beyond the original intent of the parties. In the latter part of 1947 serious disputes arose between the parties over the delay and increased costs.

Marshall has been a licensed building contractor for many years. Prior to the transaction here involved he had worked under the supervision of the Wurster firm on about 15 jobs. Construction of this job continued until just before Christmas of 1947, when it was stopped by the Terminis, who had moved into the partially completed house, and who did not want construction work continued during the Christmas period. When Marshall attempted to renew construction in January of 1948, the Terminis ordered him off the job. The house was then 82 per cent complete. When Marshall left the job he had been paid $165,478.10 in periodic progress payments as provided in his contract, the last such payment having been made on December 23, 1947, in the amount of $5,000. These are the general facts. Some of them should be set forth more fully.

There is no dispute over the existence and terms of the architects' oral contract and the contractor's written contract, these matters being admitted by the pleadings. The architects' oral contract was with the Terminis. By it the architects agreed to render achitectural services in return for a fee based on 10 per cent of the cost of labor and material used on the job. Computed on this basis, and deducting a percentage for unperformed supervision, the architects' fee amounted to $30,994.25, of which $16,319.42 was claimed and adjudged to be due.

Marshall's written contract was dated July 11, 1946, and was with LaBoi, it being conceded that all concerned expected the Terminis to pay the bills. It called for costs of labor and materials, plus 10 per cent overhead, plus 10 per cent additional for supervision of the subcontractors. It provided for monthly progress payments in architects' certificates, but only to the extent of 75 per cent of "labor and materials actually incorporated in the work during the preceding calendar month" with the remaining 25 per cent payable 35

days after completion and acceptance of the building and its delivery free of liens. Under this provision all progress payments were paid by the Terminis until March of 1947. In that month Termini offered to eliminate the withholding provision, but Marshall only accepted this offer of modification by reducing the withholding from 25 per cent to 10 per cent. Progress payments were thereafter made until December of 1947 subject to the 10 per cent withholding. Marshall's contract required him to secure all necessary permits and to operate in conformity with "all applicable laws and regulations."

The contractor and the architects stand in different legal relationships to the transaction. Marshall is, of course, an independent contractor, while the architects are the agents of the owners at least in arranging for the construction contract, issuing progress certificates, supervising the work, and in approving subcontractors.

The architects first came into the transaction in March of 1946. Most of the negotiations on the part of the architects were handled by Theodore Bernardi, one of the partners in the Wurster, Bernardi & Emmons firm. Bernardi testified that the Terminis called upon him on March 8, 1946. He then knew that houses could only be built for veterans under F.H.A. permit and that such houses were limited by a resale regulation. He told the Terminis that, since neither was a veteran, the house could not be built for them because of these restrictions. The Terminis stated that they had a nephew, LaBoi by name, who was a veteran, and who would be living with them when the house was completed. Bernardi and Emmons, another partner, testified that they accepted this statement as the bona fide intention of the Terminis, and believed it. Several conferences were held, resulting in the oral contract between the architects and Termini which was entered into in May of 1946. About this time the parties agreed that to comply with regulations it was necessary to build the house in sections except as to excavations and the foundation, which were not subject to federal regulations. Bernardi testified: "But Mr. Termini wanted to build a portion of the house that would come within the regulation of size as laid out by the F.H.A. In other words, that he had to get a permit, and he pointed out that his nephew, Jesse LaBoi, living somewhere in the Middle West, was a GI, and that he expected him to come out here and live with him, and he wanted to build this house, that it would be for Mr. and

Mrs. Termini and this nephew; so that he would make application in his [LaBoi's] name, and all the papers and drawings were carried out and made accordingly.''

Bernardi admitted that at all times his firm looked to the Terminis for payment, and, indeed, the contract pleaded by the architects was one directly with Termini. But Bernardi also testified that it was not unusual for an architect to build a house for one man while another paid the costs. He stated that at all times the architects believed in good faith that the Terminis and LaBoi were going to occupy the house as owners.

On May 22, 1946, the Terminis deeded the property in Hillsborough to LaBoi. Termini testified that the architects had suggested the plan and had also suggested he take a deed back from LaBoi and not record it, which he did. The architects denied advising or participating in this transaction. The jury obviously did not believe Termini in this respect.

Marshall testified that he came into the transaction in June of 1946 when, as a result of a telephone call from the architects, he met with the Terminis, Bernardi, and Rossi, an employee of the architects. He was then told that the house was to be built for LaBoi and the Terminis, who intended to live together. He was shown a preliminary drawing of the completed house but was told that only the ''first portion'' of the house was to be constructed at that time. No discussion was then had of veterans' priorities, or of who was going to pay for the house, or as to who LaBoi was, or where he then lived. Bernardi testified that this meeting occurred on June 25, 1946, that he then showed Marshall the preliminary sketches of the entire house, that he explained that Termini was to pay for the house, but that it was to be built for Termini's nephew, who was a veteran and who was to live with the Termnis. Marshall stated the terms upon which he would accept the job, and the meeting adjourned.

The architects made no investigation of Termini's credit rating, stating that they accepted Termini's statements to them of his ability to pay, and Marshall made no investigation of LaBoi, or of the Terminis, stating that because of his past relationships with the architects he relied upon them to protect him.

Marshall, after this June meeting, without further conversation with the architects, signed a blank form contract about July 11, 1946, naming LaBoi as the owner contracting party, and himself as contractor, and mailed it to the archi-

tects. He received back a copy with LaBoi's name typed in the place for the owner to sign. The date on this contract remained blank. Neither a starting nor a completion date was provided in the contract. Bernardi testified that he mailed the original contract to Termini for transmission to LaBoi, and was later informed by Termini that LaBoi had properly executed it. Termini testified that he signed LaBoi's name to the contract in Marshall's presence. This was denied by Marshall. A handwriting expert testified that the LaBoi signature on the Marshall contract was the same as the signature of LaBoi on another document that had admittedly been signed by LaBoi. This conflict has been resolved by the jury against Termini.

There is much conflict in the record as to when the plans and specifications were actually drawn. Marshall testified that he did not receive such plans and specifications until September of 1946, having seen preliminary sketches without working dimensions prior to that time. When he signed the contract in July he knew nothing of such luxury items as a marble bathtub, jeweled faucet handles, an underground den, an electronically controlled disappearing safe, extra fireplaces, aluminum encased windows, and many other items later ordered by Termini. Bernardi testified that preliminary sketches were first made of the entire house and then the small portion intended to be first built superimposed on the preliminary sketches. After the first preliminary sketches were made in May, Termini kept adding luxury features, so that the plans kept being changed. The first portion of the house to be built included a rumpus room with cooking facilities, the master bedroom, bathroom, and a glassed-in corridor. The other rooms to be built later were merely sketched in to locate them on the drawings.

Bernardi testified that the Terminis at first wanted to copy a house in Burlingame, which he inspected, and then told them that it would cost between $125,000 and $150,000 to duplicate. As the plans developed, rooms were deleted from the original rough plans. On July 18, 1946, Bernardi, in writing, estimated the cost of the first portion of the house as then planned at $55,000. Marshall did not know of this estimate. Bernardi stated that much of this estimate included luxury decorative items as to which there were no priority controls. Termini kept stating that cost was no object and kept developing new and expensive ideas.

The first application for a federal permit was made by

the architects in the name of LaBoi sometime in July of 1946. Marshall knew none of the details. All he knew was that on October 11, 1946, he received from the architects a project serial number issued by the federal government to be used to secure the few priority materials required on the job. Bernardi testified that he took the preliminary drawing of the entire house on which the small portion to be first built had been superimposed, filled out the necessary forms required by the F.H.A., and sent these documents to Termini for him to send to LaBoi for signature. Termini furnished Bernardi with the essential information about LaBoi, including his veteran status. Termini returned the documents, apparently properly signed, and Bernardi mailed them to the F.H.A. on July 18, 1946. This application was rejected ''for the reason that the sales price does not bear reasonable relationship to the proposed accommodations, and exceeds $10,000 for one family dwelling unit.'' Thereupon, Bernardi omitted a bathroom and the garage from the plans and the request, and reapplied on the reverse of the original application. This time the application was granted. On the original application where value of the improvement was to be listed Bernardi inserted ''To be built by self.'' This was crossed out by someone, apparently in the F.H.A. office, and ''10,000'' inserted in pencil.

Construction started in September, 1946. According to Marshall the house was built in three sections, with three separate pours of the foundation, the house expanding as federal regulations lightened. When completed, the house, in addition to the first section, contained two more bedrooms, a large living room, a dining room, kitchen, garage, an underground den and a bathroom for LaBoi's child. Marshall testified that when he started construction he was retained to build only the first portion of the house, and that he then had no intent of building a completed house. He admitted that he knew the first portion could not be built for $10,000. Bernardi testified that in November of 1946 Marshall gave him an estimate of $37,515 as the construction cost for the first unit, while Marshall's foreman estimated such cost at $43,175. Bernardi further testified that the house grew as Termini kept changing his mind and ordering expansions, and as building regulations were removed. He testified that he tried to follow the restrictions in the permits, and made changes only as regulations were lifted. By June of 1947 all regulations were lifted.

Quite early in the meetings between the Terminis and the architects discussions arose as to where LaBoi was to live in the first unit to be constructed. Bernardi stated that it was agreed that LaBoi could sleep on a couch in the playroom, and his son could sleep in a temporary room to be constructed in a hallway. This tends to support the contention of the architects that they believed in good faith that LaBoi and his son were to be bona fide residents in the house.

By February, 1947, it was necessary to file a second application with the F.H.A. to secure approval for the second portion of the house. By this time regulations as to cost of construction had been repealed, the only restriction being as to area. Bernardi sent to Termini a suggested letter to be signed by LaBoi to constitute the application to build a basement and a garage, the proposed letter stating that the garage was necessary to store LaBoi's automobile, and for storage of his goods pending construction. Bernardi testified that he then honestly believed LaBoi was going to live there as the true owner. The second application was necessary to secure priorities on steel beams to be used in the construction. This letter estimated the cost of the extensions at $3,500. Termini admitted that he signed LaBoi's name to this application, which was confirmed by a handwriting expert. It was sent to the F.H.A. and the permit granted. Marshall testified that he had no knowledge of the circumstances surrounding the making of this application, but was furnished the information necessary to secure materials by the architects.

Until December of 1947, when construction was terminated, there were monthly progress billings by Marshall and payments by the Terminis. These payments to Marshall were based on architects' certificates. Every bill was paid by the Terminis, including the October, 1947, billing, up to the November, 1947, billing. Bernardi testified that all payments sued for by the architects and contractor accrued in the fall of 1947 and after all building restrictions had been removed by the government. In the billings made by Marshall from November of 1946 through March of 1947 LaBoi was listed as the debtor, although Termini made the payments, usually in cash. Starting April 7, 1947, the name of Termini was substituted in such billings, because Termini was actually making the payments. Marshall, Bernardi, and Emmons all testified that all during construction they honestly believed they were building the house for LaBoi with the Terminis paying the

bills, such practice being not uncommon. They knew that Termini was exercising complete control over construction details and even as to modifications of the contract itself. Neither the architects nor the contractor ever saw or directly communicated with LaBoi, but they testified that they did not become suspicious until December of 1947, when the Terminis moved into the house, then still uncompleted, without LaBoi.

On these facts the jury brought in verdicts of $103,079.10 in favor of Marshall against the Terminis and LaBoi, and of $16,319.42 in favor of the architects against the Terminis. By these verdicts the jury determined that the contracts and work done thereunder were not illegal so far as the architects and contractor were concerned, or that Marshall and the architects were not *in pari delicto* with the Terminis. These verdicts were rendered May 22, 1951, and judgment on the verdicts entered the same day.

It will be remembered that the equitable action to foreclose Marshall's mechanic's lien was tried at the same time as the legal actions above discussed. On November 1, 1951, the trial court entered its judgment for the foreclosure of Marshall's mechanic's lien. This judgment was supported by findings and conclusions signed the same day. In its findings the trial court first found the major allegations of Marshall's complaint to be true and the allegations of the Terminis' and LaBoi's answers to be untrue, that the work was performed in the amount fixed by the jury, and that the contract had been breached by LaBoi and the Terminis. In reference to the defense of illegality, the court found that LaBoi in the Marshall-LaBoi contract was acting on behalf of the Terminis, that the work performed and materials furnished under it "were in violation of the Second War Powers Act of 1942, . . ., Veterans' Emergency Housing Act of 1946, . . ., Priorities Regulation 33, Veterans' Housing Program Order 1 and Housing Emergency Permit Regulation No. 5" but that on entering into the contract and performing the work Marshall "was not *in pari delicto* with defendants Jesse LaBoi, Sam F. Termini, also known as Sam Murray, and Alyce C. Termini or any of them; that said defendants and each of them were grievously at fault and that plaintiff, Frank S. Marshall, was only slightly at fault, if at all. In addition, this court finds that plaintiff, Frank S. Marshall, was not guilty of moral turpitude, whereas each of said defendants was.

"Also, if plaintiff, Frank S. Marshall, is denied relief the

loss he will suffer is wholly out of proportion to the requirements of public policy.

"This court further finds that plaintiff, Frank S. Marshall, was ignorant that the above-mentioned contract and the work performed and materials supplied thereunder were in violation of the above-mentioned federal laws and regulations, and that such ignorance was fostered and encouraged by defendants Jesse LaBoi, Sam F. Termini, also known as Sam Murray, and Alyce C. Termini."

The facts above set forth demonstrate that the implied findings of the jury in the legal actions that neither Marshall nor the architects knowingly participated in any illegal transaction are amply supported by the record. These facts disclose that the Terminis wanted and got a most ornate, luxurious and expensive home. On this appeal they now admit that they have received value of almost $120,000 for which they have not paid. The contractor has furnished material, time and money (by paying subcontractors) of $103,000 plus, for which he has not been paid. The architects have furnished time and effort valued at $16,000 plus, for which they have not been paid. The Terminis now admit that they have received these valuable services, that the services were worth that much, but urge that they knowingly committed a fraud on the government, knowingly engaged in an illegal transaction, but should be successful in avoiding payment because Marshall and the architects participated with them in violating the law. Of course, if this were true, neither Marshall nor the architects could recover. If they knowingly participated in a violation of the law such participation would bar them, regardless of how disproportionately this might benefit the Terminis. But whether they acted knowingly was a factual question. It has been resolved by the jury against the appellants. It must be remembered that appellant Termini was impeached by evidence of prior falsehoods and by his admitted forgery.

The parties discuss at length, and ably, the various phases of the law applicable to the doctrine of illegality. Many cases are cited on the subject. But extended reference to them is not required. Here the illegality asserted is that Marshall and the architects violated the federal law in participating in the building of a house for a nonveteran, and exceeded the assumed cost limitations of the regulations.

So far as the veteran provision is concerned, there can be no doubt that the Terminis at all times intended to construct

a house for themselves, and that they used LaBoi as subterfuge to avoid the applicable federal restrictions. Termini testified that he never intended that the house should be built for his nephew. There is also evidence that would have supported an implied finding of the jury, had it been made, that Marshall, and certainly the architects, knew or should have known that the use of LaBoi's name was a subterfuge. Had the jury so found, this probably would have barred respondents from affirmative relief. (*Young* v. *Hampton,* 36 Cal.2d 799 [228 P.2d 1, 19 A.L.R. 2d 830].) But the jury found to the contrary, and there is substantial evidence to support that finding. Marshall testified that he contracted with LaBoi in the good faith belief that he was to reside in the house with the Terminis as one of the owners. The architects testified that they contracted with the Terminis in the good faith belief, based on the representations of the Terminis, that LaBoi and his son were to become bona fide residents in the house. The jury believed Marshall and the architects. Thus, so far as this claim of illegality is concerned, the case is one where the Terminis misrepresented LaBoi's status to the respondents, were successful in convincing them of the truth of their misrepresentations, and now contend, in a suit between the respondents and themselves, that they can avoid paying for what they have received because they were successful in deceiving the government and the respondents. Certainly, the doctrine of illegality was never intended to operate in that fashion. The respondents, according to the supported findings of the jury, were innocent participants in the fraud.

The appellants contend that, since the permits were secured by committing a fraud upon the government by misrepresenting the status of LaBoi, the contracts of respondents (entered into before the fraud was committed) and the work done under them and under the fraudulently secured permits, were illegal, and that even if respondents had no knowledge of the illegality, they are barred from recovery because of such illegality. In this connection it is pointed out that the statutes and regulations were passed to protect veterans against contractors and architects, and that in such a case ignorance of the illegality by one not of the class intended to be benefited is immaterial.

It is undoubtedly true that, under a proper state of facts, where a regulatory statute prohibits certain acts in order to protect members of a class, and a third person without knowledge of the law enters into a contract in violation of that statute to the injury of a member of the class protected, the

member of the class may recover on the contract, and the third person may not. Thus in *Elmers* v. *Shapiro*, 91 Cal.App.2d 741 [205 P.2d 1052], where an exchange of real properties was effected with a veteran in violation of the maximum price fixed under the Veterans' Emergency Housing Act of 1946, and the veteran sued to recover the overcharge, it was held that the good faith of the third person or his lack of knowledge of the illegality were immaterial factors. The case held that from the defendant seller's standpoint, good faith, even in the form of reliance on the representations of government officials, was no defense under the act. That case involved an action for an overcharge by a veteran, a member of the class protected by the statute, against a seller of property, a member of the class the statute was intended to protect the veterans against, and involved the direct provisions of the statute granting a civil remedy to the veteran without mentioning that the violation must be willful, although the criminal provision of the statute expressly required the violation to be "willful." The case is not in point.

Appellants also urge that, although respondents were innocent of wrong, since illegality is involved, and since respondents are not of the class benefited by the statute, they cannot secure affirmative relief, although they might have urged innocence as a defense. This may be the law under some circumstances. ■ But where one party, Termini, not of the class intended to be benefited, conceives the idea and executes it of using a veteran nephew as a subterfuge so as to induce the government to issue him a permit that he otherwise could not secure, and where such party then defrauds and misleads other parties, the respondents, also not members of the class intended to be benefited, and induces them to join with him, innocently, in applying for such permit, and then the first party receives value of about $120,000 from respondents, it would be a strange doctrine that would hold, in an action between the guilty party and the innocent parties, that the innocent parties are barred from affirmative relief because of such innocent participation. That is not and should not be the law.

The other claimed violation is of the federal regulations. Appellants claim and assume that there was a $10,000 limitation as to cost as well as to resale price. That is not so. The provisions of the regulations applicable when the two permits here involved were granted contained no limitation at all as to the *cost* of construction. The basic regulation is Priority

Regulation No. 33. The pertinent subdivisions of that order in force when the contracts here involved were entered into, and when the permits were granted, provided:

"(1) Applications for authorization under Veterans' Housing Program Order 1 or for priorities assistance under this regulation or both may be made by the following:

"(i) A veteran of World War II or a member of the Armed Forces who wishes to build, alter or repair a house for his own occupancy. *A proposed sales price* (except in cases of farmhouses) must be stated, if the application covers the construction of a house, to be applicable in case of sale of the house.

"(ii) A person who wishes to build, complete or convert moderate or low-cost dwelling accommodations . . . to which veterans of World War II and members of the Armed Forces will be given preference in selling or renting. *The maximum sales price* for applications of this sort may not exceed $10,000 for a one-family dwelling or $17,000 for a two-family dwelling. . . .

"(c) If the application satisfies the requirements indicated in paragraph (b) and any applicable regulations of the National Housing Agency, if the proposed accommodations meet the standards as to space, accommodations and the like which are customary in the community for year-round occupancy, *if the proposed sales prices* or rents (where required) are reasonably related to proposed accommodations, and if the available supply of building materials reserved for the program or for the appropriate part of the program has not been fully committed, the application may be approved." (Italics added.) The complete lack of any cost limits as to homes built by the owner for his own occupancy is apparent. There is a requirement that in such cases a resale price be fixed, and, in the case of construction for resale to veterans, such resale price was limited to $10,000, except in special and hardship cases, but there was no limitation at all as to the cost of houses to be constructed for owner occupancy. Thus, under the regulations, there was no limitation at all on cost of construction, at most, there being a $10,000 limit on resale price in some cases. The first time the federal regulations fixed a cost of construction limitation was upon the adoption of Housing Expediter Priorities Regulation 5. Appellants now concede that this regulation has no application to the permits here involved, or to this case. Thus, the situation is one where the F.H.A. had the power to grant a permit regardless of the cost of construc-

tion, the only legal limitation being that, in some cases, the permittee had to agree to a resale price of $10,000. Thus, so far as this claim of illegality is concerned, as a matter of law, there was no illegality at all.

It is true that undoubtedly the evidence shows that the F.H.A. had a policy not to approve building permits, except in hardship cases, where the construction cost exceeded the agreed upon resale price. But it is also true that until Housing Expediter Priority Regulation 5 became effective the F.H.A. had the power to issue a permit, in the case of a veteran who was building for his own use, regardless of the cost of construction. Even though the F.H.A. may have been imposed upon so as to induce it to violate its policy, and even though such imposition would have been sufficient to justify it in cancelling the permit, the F.H.A. has not sought such relief, and the issued permit violated no provision of the federal law or regulations, and was a legal permit insofar as the cost of construction was concerned.

■ Appellants also contend that a grave inconsistency exists between the treatment afforded them and the treatment afforded respondents. This contention is predicated on the fact that the trial court granted the motion for a nonsuit made by respondents on appellants' cause of action for breach of contract, but denied appellants' similar motion, and, as to respondents, submitted the issue of illegality to the jury. There is no inconsistency in such rulings. Appellants' counsel, on the argument of respondents' motion for a nonsuit, admitted that the contract sued upon was illegal, and admitted that the Terminis, for this reason, could not secure affirmative relief for its breach. Inasmuch as Termini had testified that he never had intended that his nephew should live upon the property, those admissions amounted to a consent to the granting of the nonsuit against the Terminis. But, as already held, such illegality on the part of the Terminis, if respondents were innocent, would not affect the right of respondents to secure affirmative relief against appellants. Since the evidence was conflicting on the issue of respondents' innocence, that issue was properly submitted to the jury.

On this general issue of illegality, there is one other comment that should be made. Independently of any of the points discussed above, it is an admitted fact that the statutes and regulations claimed to have been violated were repealed, effective as of June 30, 1947. ■ The record shows that all of the amounts claimed by the contractor (except amounts

lawfully withheld on prior payments under the terms of the original and amended contract) were for work performed after the effective repeal date above mentioned. Except as to the withheld sums, the amounts sued for by the contractor were based upon architects' certificates from October 1, 1947, to February 26, 1948. Thus, they were for work performed between September, 1946, and January, 1948. This is conceded to be so. So far as the architects' claim is concerned, Bernardi testified that all payments sued for by them accrued in the fall of 1947. Thus, the entire amount sued for was for work performed after June 30, 1947. As to the sums withheld from Marshall for work performed prior to June 30, 1947, they were not payable under the written contract until after completion of the house, which would have been long after June 30, 1947. Those sums did not accrue or fall due until Termini made performance of the condition of completion impossible by breaking the contract in December of 1947 and January of 1948. Under these circumstances, where all sums sued for by the architects and all sums sued for by the contractor, except perhaps the sums withheld for prior work, was for work performed after repeal of the statutes and regulations, and at a time such work was perfectly legal, it is clear that, even if the original contracts and work done under them were illegal, and even if respondents participated in such illegality, such illegality and participation would not infect the claims here involved, all of which fell due after the statutes and regulations were repealed. While appellants claim that the transactions were inseverable and that the prior illegality made the entire transaction illegal, the case of *United States* v. *Fortier*, 89 F.Supp. 708, 185 F.2d 608, 342 U.S. 160 [72 S.Ct. 189, 96 L.Ed. 179], indicates quite the contrary. Common sense tells us that it could never have been the intent of Congress in passing, and later repealing, these regulatory statutes, that half finished houses, started illegally, could not be completed when restrictions were removed. The transactions were clearly severable.

The appellants next complain of several of the instructions on the issue of illegality. It is urged that the instructions erroneously left to the jury the determination of whether the contracts were illegal. It is contended that the true rule is that the jury passes on the conflicting facts and that the judge then passes on the issue of legality. ■ This contention overlooks the nature of the sole question involved on the issue of legality—did Marshall or the architects par-

ticipate in securing a permit knowing that LaBoi was being used as a subterfuge? The evidence on that issue was conflicting. The trial court properly left its determination to the jury. ■ So far as the claimed illegality as to cost price is concerned, as already pointed out, there was no illegality as a matter of law. The court should have instructed that in this respect there was no illegality. Submitting the issue to the jury was undoubtedly error, but an error favorable to appellants of which they have no legal right to complain. This holding also disposes of the contention that the court in its instructions did not tell the jury how to apply the federal regulations. Normally, such instructions should have been given, but here the regulations did not fix a cost price for one building for his own occupancy. As already pointed out, the court should have instructed that there was no illegality as to cost price. Its failure to do so or to explain the application of the federal regulations was not prejudicial error.

Objection is made to an instruction to the effect that if the Marshall-LaBoi contract was found to be illegal, Marshall could still recover for labor and materials "if you find that plaintiff Marshall did not know the contract was illegal and such ignorance, if any, was fostered by defendants." That instruction states the law in accordance with the views already expressed.

Objection is also made to the instructions embodying the doctrine of *in pari delicto*. Again the argument is made that, at most, such doctrine might constitute a defense but cannot justify the granting of affirmative relief to one not a member of the class benefited by the statute. That argument has already been disposed of adversely to appellants. The doctrine was applicable here. (*McAllister* v. *Drapeau*, 14 Cal.2d 102 [92 P.2d 911, 125 A.L.R. 800]; *Becker* v. *Stineman*, 115 Cal.App. 740 [2 P.2d 444]; *Norwood* v. *Judd*, 93 Cal.App.2d 276 [209 P.2d 24]; *Severance* v. *Knight-Counihan Co.*, 29 Cal.2d 561 [177 P.2d 4, 172 A.L.R. 1107]; *Morrison* v. *Landers*, 56 Cal.App.2d 607 [133 P.2d 34].)

While the instructions are somewhat confusing, and presented some legal issues to the jury that should have been decided as a matter of law, and certainly did not define the issues with the clarity desired in such a case, the errors, if any, were in favor of appellants. They are in no legal position to complain.

■ In the action to foreclose Marshall's mechanic's lien

it is urged that the findings of the court are inconsistent with the implied findings of the jury in the legal actions. It is urged that the jury must have found the contracts legal while the court, in the equity case, found them to be illegal. This claimed inconsistency, according to appellants, is emphasized by the action of the trial court in nonsuiting the Terminis on their cross-complaints, and in refusing such nonsuit as to respondents. As already pointed out, there was no inconsistency in granting the nonsuit as to the Terminis. Nor is there any inconsistency between the findings in Marshall's mechanic's lien case and the action of the jury in Marshall's law case. While the court found in the mechanic's lien case that the work performed under the LaBoi-Marshall contract was in violation of the statutes and regulations, in view of the facts and the law, that finding must refer to the subterfuge used by the Terminis in using their nephew's name in order to qualify as a veteran. As already pointed out, at all times here pertinent there was no cost limitation applicable, so no illegality could or did exist as to costs. Thus, the trial court's finding is simply that a fraud was practiced on the government by the Terminis in representing LaBoi to be a bona fide owner of the property— a fraud in which the jury found in the contract action that Marshall did not participate. That must also be what the court found in the equity case, because after finding that the contract was illegal, it found that Marshall was not *in pari delicto* with appellants, that the Terminis were "grievously" at fault while Marshall was "only slightly at fault, *if at all.*" (Italics added.) The court then found that Marshall was not guilty of moral turpitude while appellants were, and that Marshall was ignorant of the illegality, which ignorance was fostered and encouraged by appellants. These findings are consistent with the implied findings of the jury above discussed.

The last contention of appellants is that the jury was guilty of prejudicial misconduct in reading inflammatory newspaper articles during the course of the trial. These newspaper articles claimed to have been read by some members of the jury referred sarcastically to the evidence that had been introduced as to the many luxury features of the house that had been ordered by the Terminis. If the evidence on these issues was admissible, and it obviously was, it is difficult to see how a newspaper summary of such evidence could be prejudicially inflammatory. This point was consid-

ered by the trial court on the motion for a new trial. Its failure to grant a new trial on this ground is determinative of this issue. Its abortive order granting a new trial as against the architects was not based on this ground. Moreover, it should be pointed out that, according to the affidavits filed on the motion for a new trial, these articles appeared and were read by some of the jurors during the course of the trial, and appellants' counsel admittedly then discovered this fact. No objection was then made by him. Under such circumstances the misconduct, if any, was waived, under the rule that a party cannot sit back knowing of a claimed error and speculate upon the possibility of a favorable verdict, and then for the first time urge error after he loses. (*Zibbell* v. *Southern Pac. Co.*, 160 Cal. 237 [116 P. 513]; *Olmos* v. *Southern Pac. Co.*, 84 Cal.App.2d 765 [191 P.2d 766].)

The judgments appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.