[L. A. No. 27287. In Bank. Aug. 19, 1965.]

TRI-Q, INC., Plaintiff, Cross-defendant and Appellant, v. STA-HI CORPORATION, Defendant, Cross-complainant and Respondent; L. H. SATRE et al., Cross-defendants and Appellants.

STA-HI CORPORATION, Plaintiff, Cross-defendant and Respondent, v. LELAND H. SATRE, Defendant, Cross-complainant and Appellant.

(Consolidated Cases.)

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Roger K. Patterson for Plaintiff, Cross-defendant and Appellant, Cross-defendants and Appellants and Defendant, Cross-complainant and Appellant.

Little, Curry & Hagen, Rogers & Harris, James W. O'Neil, Phil H. Curry and Stanley Rogers for Defendant, Cross-complainant and Respondent and Plaintiff, Cross-defendant and Respondent.

PETERS, J.—These two appeals are from a single judgment rendered in two separate actions which were consolidated for the purposes of trial. In Tri-Q, Inc. v. Sta-Hi Corporation (Los Angeles Superior Court No. 765245) plaintiff and cross-defendant Tri-Q, as well as cross-defendants L. H. Satre et al., appealed from the pertinent portions of the judgment adverse to them. In Sta-Hi Corporation v. Leland H. Satre (Los Angeles Superior Court No. 769857), defendant and cross-complainant L. H. Satre first moved to set aside and vacate the judgment, and on denial of that motion, appealed from the order and from the pertinent portions of the

judgment. The District Court of Appeal rendered a single decision in which it affirmed the judgment in both actions, with a slight modification. Thereupon, Satre filed a petition in this court for a hearing only attacking the district court opinion insofar as it affirmed the judgment in action No. 769857. The petition was granted. Since the district court had rendered a single consolidated opinion, our order had the effect of annulling its decision in both cases. However, all parties appear to be satisfied with that decision insofar as it disposed of action No. 765245, for none attacked that portion of the court's opinion. We therefore adopt, as our opinion, in that action, the following portion of the opinion written by Justice Ford for the Second Appellate District, Division Three:

Tri-Q, Inc., and Sta-Hi Corporation were each manufacturers and distributors of equipment and machinery for use in the printing of newspapers.

In the action which was first filed, Tri-Q, Inc., sought to enjoin Sta-Hi Corporation from doing acts which were asserted to be violations of sections 17043 and 17044 of the Unfair Practices Act. (Bus. & Prof. Code, § 17000 et seq.) Damages were also asked. Section 17043 is as follows: "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition." Section 17044 is as follows: "It is unlawful for any person engaged in business within this State to sell or use any article or product as a 'loss leader' as defined in Section 17030 of this chapter."

With respect to the issues of fact raised by the complaint to which reference has been made and the answer thereto, the findings of fact of the trial court were in part as follows: 1. Sta-Hi Corporation did not sell its product known as "Auto-Vac Mat Pre-Dryer" at less than cost. 2. Sta-Hi Corporation did not sell that product with the intent to injure "Tri-Q, Inc., a competitor, or any other competitor, to destroy competition, or to perpetuate a monoply position in the printing-equipment industry." 3. Sta-Hi Corporation did not sell that product as a loss leader. 4. Tri-Q, Inc., suffered no damages as a direct and proximate result of the actions of Sta-Hi Corporation.

The core of the contention of the appellant Tri-Q, Inc., that the trial court erred in its determination that Sta-Hi

Corporation did not violate the Unfair Practices Act appears to be that the evidence does not support the findings of fact which have been noted hereinabove. Consequently, a discussion of the pertinent evidence is necessary.

The pre-dryer manufactured by Tri-Q, Inc., was known as the Tri-Q Toaster. The competitive product manufactured by Sta-Hi Corporation was known as the Sta-Hi Auto-Vac Mat Pre-Dryer. Mr. Oderman, vice-president in charge of engineering for Sta-Hi Corporation, testified that work commenced on the production of the Auto-Vac in April of 1960. Mr. Spitaleri, the president of Sta-Hi Corporation, testified that he made the decision as to the original selling price of $1,575 for the Auto-Vac. He did not believe that at that time he knew that the Tri-Q Toaster was being marketed at a price in excess of $1,900. Thereafter, when he raised the price of the Auto-Vac to $1,675, he knew that the price of the Tri-Q Toaster was $1,950. Mr. Spitaleri further testified that he set the original price for the Auto-Vac upon the basis of information as to the cost of materials and the hours of labor involved submitted to him by Mr. Oderman. His testimony was in part as follows: "The first computation included a 50 per cent markup on the net cost of all materials used, a figure of $15 per hour applied to the 50-man hours, estimated to be required, and then that came up to $1,610 I believe, and some odd cents, and I routed that down to $1,575, as the first price, which netted us something in excess of $14 per hour for our labor. . . . it came to $1,610.97, including labor at $15 an hour and 50 per cent markup on the total materials and purchased parts cost, reported on the September 21, 1960 engineering memorandum to me." The cost of the material was $573.89, to which was added 50 per cent or $226.99 [*sic*], making a total of $860.97 [*sic*]. Mr. Spitaleri explained the manner in which prices had theretofore been determined by Mr. Baker, the prior president of Sta-Hi Corporation: "Well, the other approach was to use figures that ranged from $11 to $12.50 an hour on our own labor and 25 per cent markup on net cost of material. The sum total of which would presumably arrive at a selling price which included profit." When the price for the Auto-Vac was increased to $1,675, effective in January 1961, that price remained in effect thereafter.

Pursuant to an order of the court, based on a stipulation of the parties, a report was made by an accounting firm upon the subject of the cost of manufacture of the Auto-Vac,

Therein it was stated that the Sta-Hi Corporation had no formal cost accounting system in 1960. The opinion was expressed that "the accounting system as employed by the company during 1960 was not adequate to provide the information necessary for the determination of reasonably accurate product unit costs of manufacture." It was stated, however, that "certain analyses could be made which would result in a range of estimated probable unit costs." The determination of the "manufacturing overhead rate" was made on two bases, one including employees' profit-sharing and bonus costs and the other excluding such costs. On the basis thereof, separate computations were made for the first production run of 1960 (a sales price per unit of $1,575 being assumed) and for the later production run of 1961 (a sales price per unit of $1,675 being assumed). In the determination of the net realization on each sale, a deduction was made of an assumed sales commission of 10 per cent of the sales price. Such calculations showed a loss on each sale inasmuch as the range of total costs for the 1960 production run was from $1,780 to $2,177 and the range of such costs for the 1961 production run was from $1,725 to $2,018. The conclusion of the report was in part as follows: "The computations described in the preceding paragraphs resulted in a range of total costs of from $1,725 to $2,117 for the manufacture and distribution of the Sta-Hi Auto-Vac Mat Pre-Dryer during 1960 computed to include an allocation of selling, administrative and general expense which is required by the provisions of the California Business and Professions Code Sections 17026 and 17029."

Mr. Walker, the accountant in charge of the work which resulted in the report to which reference has just been made, testified that it would have been impossible for Sta-Hi Corporation to have made "any exact determination of the product cost from the records as they were then maintained." He further testified: "The company has no controls on which to verify the amounts which are used for material and labor, and therefore you cannot be certain that the figures themselves are accurate." He stated that the cost figures as set forth in his report represented the minimum cost to Sta-Hi Corporation within reasonable limits, the limits being "the assumption that the figures submitted by the company are correct." Further testimony of Mr. Walker was in part as follows: "Q. Is there any reasonable method of allocating

these other overhead items, the cost of doing business, to the total cost of manufacturing the product which would be less than the current selling price? A. There is no way of telling without making a detailed analysis of items like advertising costs in order to allocate them to individual products. This might result in a lesser cost being allocated or it might result in a greater cost being allocated. There is no way of determining it.''

After stating that Sta-Hi Corporation had no cost accounting system in the year 1960 and that he was informed that such a system was being established in 1962, Mr. Walker testified as follows: ''Q. And has it been your experience that when there are no accurate cost accounting systems, that the management receives engineering estimates from the engineering department and the costs of manufactured parts from wherever the purchasing is done, and based upon that date, management comes to a decision relative to the price to be charged for a particular product? . . . THE WITNESS: I would say yes.'' He further said that the accounting system of Sta-Hi Corporation was such that ''They had no way of being certain of any reasonable assurance that the estimates they came up with were reasonable or reasonably close to the actual costs.'' Mr. Walker further testified that, according to the information furnished him, two of the machines were sold in 1960 for a price of $1,575 each and 17 were sold in 1961 for $1,575 to $1,675 each. In making the computations, Mr. Walker's firm assumed that a commission was offered on each sale.

Mr. Whitney, a certified public accountant who had been an employee of the Sta-Hi Corporation since September 15, 1961, testified that four machines were sold at a price of $1,575 and that 16 more were sold prior to the end of 1961 at a price of $1,675. At a later point in the trial, Mr. Whitney's testimony was in part as follows: ''. . . I took the average selling price of those first 6 machines, which in this case, the first 5 were sold at $1,575 and the last at $1,675, the average being approximately $1,592, and the average commission rate on those first 6 was 5 per cent. We paid commission on 3 and no commission on 3, so $80, approximately, is the average commission. The net realized on this would be $1,512. . . . The second set of columns is based upon the second cost report for machines 7 through 11. They were $1,675. They were sold at a commission rate of only 3 per cent. I believe only 2 or 3 machines were sold on commission.''

As has been noted, the trial court found that Sta-Hi Corporation did not sell its product known as "Auto-Vac Mat Pre-Dryer" at less than cost. The burden of proof with respect to that issue was upon the plaintiff Tri-Q, Inc. (*Johnson* v. *Farmer*, 41 Cal.App.2d 874, 880 [107 P.2d 959, 108 P.2d 945].) The record afforded a substantial basis for the trial court's determination that that burden had not been sustained. The product was not one with respect to which the manufacturer possessed knowledge as to costs based upon extended experience in the production of many units. While there was no basis for any inference that the inadequacy of Sta-Hi Corporation's cost-accounting procedures and records was due to any intent to circumvent any requirement of law or to conceal any information, the fact remained that during the pertinent time of production the accounting system of Sta-Hi Corporation was not sufficient to provide the information necessary for a reasonably adequate determination of the cost of manufacture of the product. As Mr. Walker stated in part: "The Company has no controls on which to verify the amounts which are used for material and labor, and therefore you cannot be certain that the figures themselves are accurate." Under such circumstances, Mr. Spitaleri exercised his judgment, as hereinabove set forth, in determining the price of the new product. Mr. Walker's testimony supported the conclusion that such procedure was that which was customarily followed in the absence of an accurate cost accounting system.

Since there was substantial support in the record for the trial court's resolution of the issue as to whether the product was sold below cost, the finding of fact with respect thereto cannot be disturbed on appeal. (*Ellis* v. *Dallas*, 113 Cal. App.2d 234, 237 [248 P.2d 63].)

But even had the trial court found that the product had been sold below cost, there would still be the issue of whether the seller had so acted "for the purpose of injuring competitors or destroying competition." (Bus. & Prof. Code, § 17043; *Balzer* v. *Caler*, 11 Cal.2d 663, 665 [82 P.2d 19]; *Ellis* v. *Dallas, supra,* 113 Cal.App.2d 234, 239.) With respect to that issue the trial court found that Sta-Hi Corporation did not sell the particular product with the intent to injure "Tri-Q, Inc., a competitor, or any other competitor, to destroy competition, or to perpetuate a monopoly position in the printing-equipment industry."

Support for the finding as to the lack of an improper purpose is found in the testimony of Mr. Spitaleri. Testimony on his part, in addition to that set forth hereinabove, was as follows: "Q. Now, that price was established in September of 1960. Did you as a representative of management of Sta-Hi have any intent to sell below cost or fix that price below your cost? A. Absolutely not. Q. And how about the establishment of the price in December of 1960, when the second memorandum was submitted to you? A. No. I thought as a matter of fact, that this represented a pretty healthy profit, higher than our average, if there is such a thing."

The testimony of Craig C. Baker, the chief executive officer of Sta-Hi Corporation, was in part as follows: "Q. Mr. Baker, when the Sta-Hi Auto-Vac Mat Pre-Dryer was first offered for sale to the public, do you know of any Sta-Hi company policy or pronouncement or decision to sell those products at less than cost? A. No, sir. . . . Q. Was it the intent of the Sta-Hi management to sell that item at a profit? A. Oh, definitely. Q. Was there ever any intent on the part of Sta-Hi's management as far as you know, to hurt or injure any other competitor by the sale of that product? A. No. Q. Was there ever any attempt or discussion among management of Sta-Hi, seeking to destroy the business of Tri-Q, Inc.? A. Not in my presence. Q. Were there ever any discussions that you heard, indicating that the Sta-Hi Auto-Vac Mat Pre-Dryer might be sold as a 'loss leader'? A. No."

A consideration of section 17071 of the Business and Professions Code in the light of the evidence before the trial court does not alter the conclusion expressed hereinabove with respect to the finding that Sta-Hi did not seek to achieve an improper purpose. Section 17071 is as follows: "In all actions brought under this chapter proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition." In *People* v. *Pay Less Drug Store*, 25 Cal.2d 108 [153 P.2d 9], an action to enjoin violation of the Unfair Practices Act, the court said at page 114: "Proof of injurious effect is permitted to be shown with the proof of sales below cost as presumptive or prima facie evidence that the requisite intent existed. The obvious and only effect of this provision is to require the defendants to go forward with such proof as would bring them within one of the exceptions

or which would negative the prima facie showing of wrongful intent. . . . Our statute does not withdraw from the accuser the burden of proving a violation, nor does it deprive the defendant of the benefit of the presumption of innocence.''[1]

It appears that inferences favorable to the position of Sta-Hi Corporation were drawn by the trial court from the evidence, heretofore related, as to the circumstances under which the determination of price was made in each of the two instances. That evidence was sufficient to render the presumption embodied in section 17071 of the Business and Professions Code of little evidentiary value. Consequently, it does not appear to be probable that a result more favorable to the plaintiff Tri-Q, Inc., would have been reached by the trial court even if it had found that such prices were less than the actual cost of the product.

In the first action a cross-complaint was filed by Sta-Hi Corporation. Named therein as cross-defendants were Tri-Q, Inc., L. H. Satre, Charles L. Burdett, Jasper A. Burdett, and, also, Charles L. Burdett, doing business as Burdette Service & Rebuilding. Portions of the findings of fact pertinent to contentions made on this appeal by the cross-defendant Tri-Q, Inc., are as follows: 1. ''The cross-defendant Tri-Q, Inc. and the cross-defendant Charles L. Burdett, doing business as Burdette Service & Rebuilding, although not given authority nor permission to do so, have used the name of the cross-complainant Sta-Hi in their advertising and literature which is used in the promotion of their products.'' 2. ''Cross-defendant Tri-Q, Inc., acting in conjunction with cross-defendant Charles L. Burdett, doing business as Burdette Service & Rebuilding, has used the name of cross-complainant Sta-Hi without the permission or consent of Sta-Hi in a misleading manner.'' 3. ''The advertising and literature of cross-defendant Tri-Q, Inc., as well as that of the cross-defendant Charles L. Burdett, doing business as Burdette Service & Rebuilding, was misleading where the name

[1]In view of the erroneous argument made on behalf of the plaintiff Tri-Q, Inc., that the trial court imposed upon it a duty to overcome a presumption of innocence which ''was inappropriate to a civil action,'' we direct attention to the following statement in Witkin, California Evidence (1958) section 64, page 83: ''Distinct from the basic presumption of innocence in criminal trials (P.C. 1096; . . .) are several similar ones applicable to civil cases: (a) 'That a person is innocent of crime or wrong.' (C.C.P. 1963(1).) (b) 'That private transactions have been fair and regular.' (C.C.P. 1963(19).) (c) 'That the law has been obeyed.' (C.C.P. 1963(33).)''

of Sta-Hi was utilized and where pictures of machinery manufactured by Sta-Hi were depicted.''

The conclusions of law based on such findings of fact were expressed as follows: 1. The cross-defendants designated in the findings of fact ''have unfairly competed with Sta-Hi Corporation by the use of the name 'Sta-Hi' in their advertising and literature and by depicting therein products manufactured by Sta-Hi, both of said actions constituting unfair, untrue or misleading advertising.'' 2. ''Cross-complainant Sta-Hi Corporation is entitled to judgment against cross-defendants Tri-Q and Charles L. Burdett . . . permanently enjoining said cross-defendants . . . from using the name of Sta-Hi Corporation in their advertising and literature and from depicting Sta-Hi products by pictures or otherwise, except that if they do so, they must state that they are in no way connected with Sta-Hi; and if reference is made to parts manufactured by Tri-Q for any equipment manufactured by Sta-Hi, it must state that they are manufactured by Tri-Q without contract or license from Sta-Hi. Every word noting such limitation shall be of the same size, color, type and general distinctiveness as the other part of such advertising or literature.'' Embodied in the judgment was a permanent injunction consonant with the conclusion of law just stated.

Since Charles L. Burdett and Jasper A. Burdett have abandoned their appeal from the portion of the judgment granting a permanent injunction, the question to be determined is the propriety of such relief as against Tri-Q, Inc.

The Burdetts and L. H. Satre were formerly employed by Sta-Hi Corporation. The employment of Jasper A. Burdett as a machinist commenced on June 18, 1945, and ended on March 25, 1960. Charles L. Burdett was employed from April 21, 1941, to December 31, 1958, as Sta-Hi's shop foreman and shop superintendent. Thereafter he established a business known as ''Burdette Service & Rebuilding.'' He was a director of Tri-Q, Inc. L. H. Satre entered the service of Sta-Hi Corporation on a part-time basis on or about January 21, 1947. In June of 1949, he became a full-time employee, holding the position of chief engineer. About March 5, 1955, he was elected as a vice-president of Sta-Hi Corporation and held that position until the end of February 1959. Mr. Satre was a director of Sta-Hi Corporation from July 5, 1947, to about August 11, 1959.

Mr. Satre testified that Tri-Q, Inc., had three employees as

of the time of trial and that those employees were the three officers. The employees were the two Burdetts and Mr. Satre. There had been other employees. Mr. Satre was president of Tri-Q, Inc., and Charles Burdett was treasurer. Jasper Burdett was secretary of Tri-Q, having held that office since Tri-Q's formation about September of 1959. Jasper Burdett acted as production manager.

Burdette Service & Rebuilding carried on its operations from the same plant as Tri-Q. In response to a question as to the relationship between that organization and Tri-Q, Inc., Mr. Satre testified: ''Well, since the formation of Tri-Q, we regarded them as separate entities. Burdette Service & Rebuilding was a rebuilding service operated by Mr. Burdett for his personal—as his personal project; and Tri-Q, Inc., was a machinery manufacturer. Now, the reasoning behind this was to keep these two organizations separate so that there wouldn't be any reflection on Tri-Q in event Mr. Burdett decided to discontinue his rebuilding service.''

Mr. Satre further testified that about February of 1961, Tri-Q had furnished parts for use by Mr. Burdett in his rebuilding service, but had not participated in any of Mr. Burdett's receipts for the performance of services. Mr. Satre also testified that ''certainly'' since February of 1962, the two operations were carried on separately. Mr. Burdett paid no rent to Tri-Q for the premises used by him and paid no share of the overhead from his business. Part of Mr. Satre's testimony was: ''Q. By the way, when that business was first commenced, it was your understanding that Mr. Burdett was buying the parts he needed for repair or replacement from Sta-Hi, is that correct? A. Yes. Q. Subsequently, Tri-Q commenced to manufacture parts for repair of Sta-Hi equipment, is that correct? A. Yes. Q. Were you licensed by Sta-Hi to produce any of their equipment? A. No. Q. You just did it? A. Yes. . . . Q. You knew that Mr. Burdett was issuing advertisements depicting Sta-Hi machinery and indicating that Burdette Service & Rebuilding was qualified to rebuild it or repair it in the field? A. Yes. Q. Were the customers advised that the parts that were being used were not Sta-Hi parts but were Tri-Q parts? A. Yes. Q. Certainly after this written memorandum of February '62, is that correct? A. Yes.''

Charles L. Burdett testified that after some difficulty at the time of a Scripps-Howard ''deal'' with respect to a 10 per cent commission on parts purchased from Sta-Hi Corporation, he decided to make some of the parts himself. He as-

sisted Tri-Q in the manufacture of parts to be used in machines which had been built by Sta-Hi Corporation. He further testified: "Q. . . . State whether it is Tri-Q or Burdette Service & Rebuilding that builds parts? A. It is Tri-Q. Q. You are an officer and an employee of Tri-Q, is that correct? A. Yes. Q. Now, in that capacity did you assist in the manufacture of parts to be used in Sta-Hi Corporation built machines? A. Yes. Q. And have you had occasion since the Scripps-Howard matter to use these parts in the field? A. Yes. Q. Have you at any time represented to any purchaser or prospective purchaser that the parts which you use are manufactured by Sta-Hi Corporation? A. Absolutely not." Another portion of Mr. Burdett's testimony was as follows: "Q. If you were going to go out today to do a Burdett repairing and rebuilding job on Sta-Hi equipment, you would rebuild it with Tri-Q parts? A. Yes." He further testified that Tri-Q did not manufacture a complete line of parts for all Sta-Hi equipment but did so only for the Sta-Hi former. Tri-Q would bill the customer for the parts supplied by it. As to his labor performed on a job, Mr. Burdett testified: "Tri-Q bills them, but they reimburse me 100 per cent for every hour I turn in." The rate was $9 an hour, which included his expenses from the time he left his place of business until he returned.

Mr. Oderman, an engineer employed by Sta-Hi Corporation, testified in part as follows: "Q. Isn't it also true that many of the products in the master former are available on the open market? A. Yes. Many of the components are available such as motor coils, solenoids and push buttons. Q. And is it not also true that many of the parts which Sta-Hi sells and distributes are parts which it obtains from other manufacturers and just sells them? A. Yes. The motors, blowers, all equipment that it purchases for its master former is available for resale or breakdown." In response to an inquiry as to whether there was some equipment that could not be purchased on the open market, the witness stated: "Yes. . . . but one of the things, and one of the reasons why we have purchases made through our office is that it gets our guarantee as well as the manufacturer's guarantee, and our guarantee usually exceeds the manufacturer's guarantee."

Mr. Spitaleri, the president of Sta-Hi Corporation, testified that no authorization was given to Tri-Q to manufacture parts for use on master formers.

Reference will now be made to pertinent exhibits. One exhibit was an advertisement of "Burdette Service & Rebuild-

ing" which contained the picture of Charles L. Burdett. One statement therein was: "Any Former can be modernized in your own plant . . . and all of the 1960 modifications may be incorporated into your old machine." The names of newspapers were contained in a list of "a few of our customers."

In another advertisement containing the name "Burdette Service & Rebuilding" was a picture of two formers. At the top of the advertisement was the statement: "get better than new performance from your old machine." Underneath the picture was the following statement: "This is an actual unretouched photograph of two Formers in the plant of the Louisville Courier Journal in Louisville, Kentucky. Both machines are fourteen years old . . . the one on the right has not been modernized, while the other has been rebuilt and modernized by Burdette Service & Rebuilding, and includes all modifications found on brand new 1960 models." Mr. Burdett testified that the formers pictured were Sta-Hi equipment. He further testified that the Louisville Courier Journal was one of the customers that Sta-Hi had paid him "to go to see."

Another exhibit consisted of communications addressed by Tri-Q, Inc., to the Miami Herald in April and May of 1960. One letter, dated April 2, 1960, was in part as follows: "We are a new company in the Stereotype Equipment Manufacturing business, organized only last September. The three officers in this company, L. H. Satre, J. A. Burdett, and C. L. Burdett, were associated with Sta-Hi Corporation in responsible positions, for twelve, fifteen, and eighteen years, respectively.

"Mr. C. L. Burdett is the owner of Burdett Service and Rebuilding and has been travelling across the country rebuilding Master Formers in many of the larger plants;

"We are also equipped to do maintenance work on Master Formers. Mr. Burdett has been rebuilding older machines and adding all of the new features listed in the Sta-Hi Corporation advertisement in the March 1960 issue of Printing Production. If you would like to have any of these improvements added to your machines, we will allow you a ten per cent (10%) discount on parts and labor in return for the use of your facility. . . ." The letter appears to have been written in contemplation of a convention or mechanical conference in Miami which had been arranged for June of that year.

In the exhibit just noted was a reference to the March 1960 issue of the magazine entitled Printing Production. A page thereof was received in evidence. That page contained an advertisement which was in part as follows: "SPECIALIZED SERVICE and rebuilding of STA-HI equipment. Former superintendent of STA-HI (18 years) offers complete maintenance and rebuilding service for your machine . . . in your plant. Write, wire or phone Charles Burdett, . . ."

Another exhibit is to be noted. On a letterhead of "Burdett Service and Rebuilding" it was stated: "I am taking this opportunity to acquaint you with a new maintenance service I am offering on Sta-Hi stereotype equipment. . . . As Shop Superintendent for Sta-Hi Corporation for 18 years, I supervised the building of all of their machinery and tested over 1700 Master Formers. I designed many of the improvements that are on the present machines. . . . To completely rebuild a Former and refinish it, the cost is about $1,250.00 . . . . All parts are the same as the factory uses. . . . The completed machine will be equal to the present models both in appearance and operation." It was also stated that the prices quoted were "$700 to $1100 below the cost of sending the machine back to the factory for rebuilding." The printed name "Charles Burdett" was at the end of the communication. The communication appears, however, to have been used prior to the formation of Tri-Q, Inc.

The problem presented is that which is noted in the first paragraph of section 138 of Nims on Unfair Competition and Trademarks (4th ed. 1947) in the following language: "A manufacturer of a device cannot prohibit competition in the making of unpatented replacement and repair parts for that device, but he is entitled to protection from unfair competition in the marketing of such parts by others. These parts must, of necessity, be exact copies in form and shape of the original parts; and the question in these cases is as to what constitutes a representation that they are made by the original manufacturer?"

As stated in *Electric Auto-Lite Co.* v. *P. & D. Mfg. Co.*, 78 F.2d 700, at page 703, "The wrong in unfair competition consists of the sale of goods of one manufacturer as those of another." Unlike the factual situation in the *Auto-Lite* case, the evidence in the present case gave ample support to the determination that the conduct in which Tri-Q, Inc., knowingly participated was deceptive in nature. The trial court was justified in drawing the inference that Tri-Q, Inc., and Charles L. Burdett used the name of

Sta-Hi in their advertising efforts in a manner which was misleading in that their communications directed to prospective customers were framed in language which reasonably conveyed the meaning that Sta-Hi parts were used by Burdett in the rebuilding of Sta-Hi equipment, whereas parts made by Tri-Q under Burdett's supervision were in fact used. (See *Audio Fidelity, Inc.* v. *High Fidelity Recordings, Inc.*, 283 F.2d 551, 554-555.)

The portion of the judgment embodying the permanent injunction is as follows: ''Cross-defendants Tri-Q, Inc. and Charles L. Burdett, doing business as Burdette Service & Rebuilding, and their respective agents, servants, officers and directors, and all persons acting in conjunction with them, be, and they hereby are, permanently restrained and enjoined, from the date of this judgment forward, from using the name of cross-complainant Sta-Hi Corporation in their advertising and literature and from depicting Sta-Hi products by pictures or otherwise, except that if they do so, their said advertising and literature must state that they are in no way connected with Sta-Hi Corporation; and if reference is made to parts manufactured by cross-defendant Tri-Q, Inc. for any equipment manufactured by cross-complainant Sta-Hi Corporation, such reference must state that they are manufactured by Tri-Q, Inc. without contract or license from Sta-Hi Corporation. Furthermore, every word noting such limitation shall be of the same size, color, type and general distinctiveness as the other part of such advertising or literature.''

On behalf of Tri-Q, Inc., it is briefly argued that the ''decree is inappropriate.'' Under the circumstances presented to the trial court, for the purpose of preventing deception in the future it was prudent to provide that if Tri-Q, Inc. and Charles L. Burdett used the name of Sta-Hi in their advertising and literature, they were required to state that their operations were not connected with Sta-Hi Corporation. It does not appear, however, that it was necessary for Tri-Q or Burdett to obtain any license or enter into any contract with Sta-Hi Corporation for the manufacture of the parts herein involved. Since no sound purpose was served by the inclusion of the portion requiring a statement that such manufacture is ''without contract or license from Sta-Hi Corporation,'' the quoted language should be stricken from the judgment.

The injunction, when read as a whole, affords adequate

protection against deception without the language which is to be eliminated. The particular factual situation before the court was one for which Tri-Q, Inc., and Charles L. Burdett were responsible and, except as to the portion to be stricken, this court is not impelled to hold that the trial court exercised other than a sound judgment in the light of the problem presented to it.

While the foregoing quoted portion of the District Court of Appeal opinion thus disposes of action No. 765245, we turn now to the second action (No. 769855). This was brought by Sta-Hi Corporation (hereinafter referred to as "Sta-Hi") against Leland H. Satre (hereinafter referred to as "Satre") for the purpose of rescinding a certain agreement, to recover money paid thereunder, and for declaratory relief. Satre cross-complained for the balance of the money alleged to be due to him under that agreement. The appeal in that action involves the proper application of the so-called rule of *in pari delicto*. By that phrase, we refer to the general rule that the courts will deny relief to either party who has entered into an illegal contract or bargain which is against public policy. (*Moore* v. *Moore,* 130 Cal. 110 [62 P. 294, 80 Am.St.Rep. 78], and the many cases which have since followed that authority.) The question we are required to determine is whether the facts of this case come within that general rule or within an exception thereto.

In 1952 Satre (an officer and shareholder of the corporation), Sta-Hi and a trust company (in its capacity as trustee for the Sta-Hi employees' profit-sharing trust) entered into an agreement under the terms of which Satre gave the other parties an exclusive option to purchase all stock of the corporation held by him on termination of his employment, at a price to be determined according to a formula set forth therein. When Satre terminated his employment, in February 1959, he owned 37,000 shares of Sta-Hi stock. These had cost him $43,376.40. The option price, determined by the 1952 formula, was $72,150. Negotiations were commenced for the purpose of determining whether the options were to be exercised, and if so, in what manner. By August 1959 those negotiations had resulted in an oral agreement that Satre would receive a total of $70,000 for his shares, that the trust would take one half (18,500 shares) for the sum of $25,000 in cash, and that Sta-Hi would take the balance, for which it would pay the remaining $45,000. However, Sta-Hi's officers insisted that its portion of the contract be written to indicate a

cash payment of $25,000 for its share of the stock, and that the remaining $20,000 be paid under a separate agreement, backdated to March 1959 and providing for 10 semiannual payments of $2,000 each for certain nonexistent considerations. Accordingly, Sta-Hi's officers drafted such documents and presented them to Satre for signature. In addition to the two contracts for the sale of the stock, each providing for a cash payment of $25,000, Satre was presented with a third agreement, dated March 16, 1959, and entitled "Severance Benefit Agreement." According to the terms of the latter, Sta-Hi was to pay to Satre 10 semiannual installments of $2,000 each, commencing September 1, 1959, in consideration of the assignment of certain patent rights. Both Sta-Hi and Satre understood that the recited consideration was not the true consideration, and that the third agreement was actually intended to provide for the payment of the remaining $20,000 of the agreed purchase price of the stock. All documents were executed on August 11, 1959, on which date Satre delivered one half of his stock to the trust and one half to Sta-Hi, and received $25,000 from each. Sta-Hi's officers and directors did not mention the "Severance Benefit Agreement" in the August minutes, but altered the March minutes to indicate its execution on March 16th (the month after Satre's termination of employment). Satre was aware of this subterfuge by the officers and directors of the corporation.

Sta-Hi made the first four payments (totaling $8,000) to Satre, and then brought this action based on the "Severance Benefit Agreement." It alleged that Satre had breached a clause of that agreement providing that he would not thereafter enter into competition with Sta-Hi, and sought rescission, restitution of the $8,000 already paid, attorney fees as provided in the agreement, and (in the alternative) declaratory relief adjudicating the rights of the respective parties under the agreement.[2] Satre cross-complained for the balance due which, under the terms of the agreement, became accelerated when the fifth installment was not paid, and for his attorney fees. Although the pleadings had not raised the issue, the evidence indicated that the "Severance Benefit Agreement" was intended by both parties to provide the

---

[2] When the court sustained demurrers on the ground that the provision not to compete was an unlawful agreement under Business and Professions Code section 16600, Sta-Hi filed a second amended complaint alleging fraud in that Satre induced it to execute the agreement on the basis that he would not compete, while intending to do so.

balance of the consideration for the stock, and that Sta-Hi had insisted on the subterfuge to give it an improper income tax advantage. Satre testified (without substantial conflict) that although he was aware of what Sta-Hi was doing, his sole purpose in executing the agreement was to obtain the full purchase price agreed upon for his stock, which he was unable to obtain without satisfying Sta-Hi's demands as to the form of the agreements.

The trial court made findings substantially as set forth above, but in which it made no distinction between the purposes of Sta-Hi and Satre in executing the agreement. In that regard it found that the agreement afforded a means by which both parties could have taken improper tax advantage of the federal and state governments, was entered into by both parties for tax purposes, was against public policy and should be treated as illegal. It further found that (in view of the latter finding) it was unnecessary to make findings on the other issues raised by the pleadings. It then concluded, among other things, that the parties were *in pari delicto,* and that neither party was entitled to relief.

There is no doubt that the general rule requires the courts to withhold relief under the terms of an illegal contract or agreement which is violative of public policy. (*Moore* v. *Moore, supra,* 130 Cal. 110; *Wise* v. *Radis,* 74 Cal.App. 765, 775-776 [242 P. 90].) It is also true that whatever the state of the pleadings, ''when the evidence shows that . . . [a party] in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids.'' (*Lewis & Queen* v. *N. M. Ball Sons,* 48 Cal.2d 141, 147-148 [308 P.2d 713].) These rules are intended to prevent the guilty party from reaping the benefit of his wrongful conduct, or to protect the public from the future consequences of an illegal contract. They do not necessarily apply to both parties to the agreement unless both are truly *in pari delicto.* In *Norwood* v. *Judd,* 93 Cal.App.2d 276, it was said (at pp. 288-289 [209 P.2d 24]) : ''The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound public policy. But the courts should not be

so enamored with the Latin phrase *'in pari delicto'* that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.''

*Norwood* has been cited with approval and followed in a long line of cases. *Lewis & Queen* v. *N. M. Ball Sons, supra,* 48 Cal.2d 141; *Wilson* v. *Stearns,* 123 Cal.App.2d 472, 481-482 [267 P.2d 59]; *Marshall* v. *LaBoi,* 125 Cal.App.2d 253 [270 P.2d 99]; *Holland* v. *Morgan & Peacock Properties Co.,* 168 Cal.App.2d 206, 211 [335 P.2d 769]; *Iusi* v. *Chase,* 169 Cal.App.2d 83, 87 [337 P.2d 79]; and *Nevcal Enterprises, Inc.* v. *Cal-Neva Lodge, Inc.,* 217 Cal.App.2d 799 [32 Cal. Rptr. 106], are but a few. While many of these cases involved the situation in which a real estate broker sought commissions due under a contract entered into at a time when he was not licensed, some arose under other circumstances. Thus in *Denning* v. *Taber,* 70 Cal.App.2d 253 [169 P.2d 900] (prior to *Norwood)* it was held that one of the two partners who had conducted a saloon business in contravention of the law and who had, on liquidation of the illegal enterprise, agreed to divide the assets, could maintain an action for accounting against his partner even though the assets held by the latter had been obtained in the joint conduct of the illegal enterprise.

The exception to the rule is stated as follows by Corbin: ''A bargain may be illegal by reason of the wrongful purpose of one or both of the parties making it. This is true even though the performances bargained for are not in themselves illegal and even though in the absence of the illegal purpose the bargain would be valid and enforceable. A party who makes such a bargain in furtherance of his wrongful purpose can not enforce it, *even though it is enforceable against him by the other party if the latter is innocent of such a purpose.*'' (Italics added.) (6A Corbin on Contracts (1962) § 1518, p. 744; see also Rest., Contracts, §§ 600-603.)

A clear statement of the exception to the general rule appears in *Lewis & Queen* v. *N. M. Ball Sons, supra,* 48

Cal.2d 141, where the court, after first setting forth the policy behind the general rule, stated (at p. 151): "In some cases, . . . effective deterrence is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit; or the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. In each case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved."

If these rules be applied to the facts of this case no reason appears why Satre should be denied the aid of the courts in obtaining the agreed consideration for the assets which he has delivered to Sta-Hi. Except for payment of that consideration, "the transaction has been completed," and the public requires no further protection.[3] Sta-Hi is clearly guilty of the greater moral fault, and Satre's conduct involved little, if any, serious moral turpitude.[4] Certainly, refusal of the courts to enforce the agreement would "permit defendant [Sta-Hi] to be unjustly enriched at the expense of plaintiff." Such a course would result in a forfeiture "disproportionately harsh considering the nature of the illegality," and the respective conduct of the parties. Finally, "effective deterrence . . . [will be] best realized by enforcing plaintiff's [Satre's] claim rather than by leaving the defendant [Sta-Hi] in possession of the benefit."

The trial court, while quite correctly expressing moral indignation at the attempt to defraud the two governments, actually frustrated the purpose of the general rule on which it relied. Sta-Hi was the party who sought either rescission or declaratory relief. Because the contract (under which Sta-Hi had paid the first $25,000 of the consideration intended for the stock) had been fully executed, and the stock delivered, Satre's only remedy was to seek enforcement of the very

---

[3]The findings of the trial court merely state that the parties *could have obtained* a tax advantage from the form in which the agreement was drawn. They do not indicate that either party has done so. Refusal to enforce the terms of the agreement requiring Sta-Hi to make payment will not alter the tax obligations of either party at this point. Furthermore, it is doubtful that the trial court was correct in assuming that Satre could benefit, tax-wise, from the duplicity required by Sta-Hi. If he reported the capital gain on the sale of his stock at $20,000 less than the true figure the tax saving might be considerably less than the tax on the extra $4,000 of income per year for the next five years.

[4]Since it is not suggested that Satre entered into the "Severance Benefit Agreement" for any purpose other than to obtain the agreed consideration for his stock, his only moral fault arose out of his knowledge of Sta-Hi's illegal purposes and actions.

agreement which Sta-Hi sought to rescind. By refusing to enforce that agreement, the trial court, in effect, granted Sta-Hi's request for declaratory relief. The unintended result of such judgment was to grant relief to the wrongdoer, while denying such to the party who was guilty of little, if any, moral turpitude.

The judgment must be reversed insofar as it relates to action No. 769857. However, since the trial court did not pass upon the issue of fraud, or upon other issues arising from the pleadings which may affect the result, that action must be remanded for further proceedings.

The single judgment entered in the consolidated cases is reversed and the causes are remanded to the trial court with the following instructions:

1. To enter judgment in action No. 765245 in the same manner as expressed in the first two numbered paragraphs of its former judgment, but striking therefrom the words, "without contract or license from Sta-Hi Corporation."

2. To take further proceedings in action No. 769857 not inconsistent with the views expressed herein.

Respondent Sta-Hi Corporation shall recover its costs on appeal in action No. 765245 from the appellants therein. Appellant Leland H. Satre shall recover his costs on appeal in action No. 769857 from respondent Sta-Hi Corporation. Insofar as any individual item of cost is attributable to both appeals, the trial court shall apportion the same between the two appeals as justice requires.

Traynor, C. J., McComb, J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.